**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **GERALD HARRIS,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:11-CV-1089-M-BH** |
| | § | |
| **MICHAEL J. ASTRUE,** | § | |
| **Commissioner of Social Security,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition. Before the Court is *Plaintiff's Motion for Summary Judgment*, filed August 24, 2011 (doc. 16). Based on the relevant filings, evidence, and applicable law, the plaintiff's motion should be **GRANTED**, the decision of the Commissioner should be **REVERSED**, and the case should be **REMANDED** for reconsideration.

## I. BACKGROUND[1]

**A.    *Procedural History***

Gerald Harris (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for disability benefits and supplemental security income benefits under Title II and XVI of the Social Security Act. (R. at 1-4.) Plaintiff applied for disability insurance and supplemental security income benefits in January 2009, alleging disability beginning November 12, 2007, due to bilateral knee arthritis and blood clots in his legs. (*Id*. at 131-133, 134-141, 195.) His claims were denied initially and upon reconsideration. (*Id*. at 59-65, 70-

---

[1]  The background comes from the transcript of the administrative proceedings, which is designated as "R."

74.)  Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on December 7, 2009.  (*Id*. at 29, 80-82.)  On March 16, 2010, the ALJ issued a decision finding Plaintiff not disabled.  (*Id*. at 10-22.)  Plaintiff appealed, and the Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner.  (*Id*. at 1-4.)  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (*See* Doc. 1.)

**B.**     *Factual History*

    **1.**     **Age, Education, and Work Experience**

Plaintiff was born in 1960.  (R. at 131.)  He has an 11th grade education and past relevant work experience as a commercial painter.  (*Id*. at 30-34.)

    **2.**     **Medical Evidence**

On November 12, 2007, Plaintiff was admitted to Dallas Regional Medical Center.  (*Id*. at 261-266.)  He complained of chest pain, and leg swelling and pain and he had a fever.  (*Id*. at 262, 264-265.)  He underwent a chest CT and was diagnosed with bilateral pulmonary emboli.[2]  (*Id*. at 262, 265.)  The CT report also showed changes  consistent with chronic obstructive pulmonary disease.  (*Id*. at 266.)  His international normalized ratio[3] (INR) upon admission was 0.9.  (*Id*. at 264.)  Plaintiff was treated with heparin and converted to Coumadin.  (*Id*. at 265-266.)  On

---

[2]  Pulmonary embolism is a condition that occurs when one or more arteries in the lungs become blocked. Mayo Clinic Staff, *Pulmonary embolism*, http://mayoclinic.com/health/pulmonary-embolism/DS00429.  It is caused by blood clots that travel to the lungs from another part of the body, often the legs.  (*Id*.)

[3]  INR scores are determined by blood tests that measure the clotting ability of a patient's blood.  Mayo Clinic Staff, *Warfarin*, http://www.mayoclinic.org/quality/warfarin.html.  The INR is calculated by measuring the patient's prothrombin time test result to a normal value for a prothrombin time test taken in a laboratory.  Mayo Clinic Staff, *Prothrombin time test*, http://www.mayoclinic.com/health/prothrombintime/MY00150/DSECTION= results.  (last updated August 21, 2010).

November 22, 2007, he was discharged from the hospital in stable condition with his INR at 1.6 and climbing.  (*Id*. at 263.)  He was instructed to continue taking Coumadin for 3 to 6 months and to have his INR level monitored to keep it between 2 and 3.  (*Id*. at 262-63.)

On November 27, 2007, Dr. Sireesha Janga completed a medical statement concluding that Plaintiff could not work.  (*Id*. at 424.)  Dr. Janga listed bilateral pulmonary emboli as the disabling condition but noted that Plaintiff's inability to work was indefinite, e.g., it might not be permanently disabling.  (*Id*.)  The form noted the need for 18 months of anticoagulation therapy.  (*Id*.)

On November 28, 2007, Plaintiff was admitted to Parkland Hospital in Dallas, Texas.  (*Id*. at 325, 353.)  He complained of chest pain with nausea and vomiting and lower leg edema.  (*Id*. at 307, 311.)    The record noted Plaintiff had a subtherapeutic INR of 1.1 at the time of admission. (*Id*. at 307, 323.)  The record also noted "clubbing, cyanosis negative" on the right lower extremity and "full range of motion" as to the left lower extremity.  (*Id*. at 313.)  His physicians ordered an EKG, chest x-rays and an ultrasound of Plaintiff's legs.  (*Id*. at 314, 323, 353-354.)  The EKG was unremarkable.  (*Id*. at 323, 428.)  The x-rays showed no significant radiographic abnormality.  (*Id*. at 354.)  The ultrasound showed no evidence of venous thrombosis in the deep veins of either lower extremity but noted superficial thrombosis in both lesser saphenous veins.  (*Id*. at 314, 353.)  He also underwent genetic testing and the tests were negative for the R506Q and G20210A mutations.  (*Id*. at 330-332.)  His physicians increased his Coumadin dose and added Lovenox to treat his pulmonary embolism.  (*Id*. at 323.)  Plaintiff was discharged on December 3, 2007 with an INR of 1.2.  (*Id*. at 275, 325.)  He was given instructions to continue taking Lovenox until he reached a therapeutic INR level and to follow up with the anticoagulation clinic on December 10, 2007, and the internal medicine clinic in 4 weeks.  (*Id*. at 323-324.)  His medications at the time of discharge included

Coumadin, Lortab and Metroprolol. (*Id*. at 324.)

On December 10, 2007, Plaintiff visited Parkland's Anticoagulation Management Clinic (AMC). (*Id*. at 338.) He saw Physician Assistant (PA) Cynthia L. Cope-Tome. (*Id*. at 338, 367.) Upon testing his INR was 1.9. (*Id*. at 338.) The record noted tenderness in his right calf. (*Id*.) There was no swelling in his extremities. (*Id*.) He complained of dizziness, that morning and admitted to having intermittent pain all day long. (*Id*.) While in the clinic he complained of substernal pressure-type chest pain with diaphoresis and nausea. (*Id*.) Plaintiff was transported to Parkland Hospital's emergency room via ambulance. (*Id*.)

At the emergency room, Plaintiff complained of left-sided chest pain and nausea. (*Id*. at 347.) He described the pain as similar to what he experienced with the prior pulmonary embolism. (*Id*. at 344, 347.) He described his pain as severe and said it worsened with movement and deep breathing. (*Id*. at 347.) He also complained of pain to his right knee and calf. (*Id*.) Plaintiff was given Lortab, and it relieved his pain. (*Id*. at 344, 347-348.) Dr. Ryan Randles ordered an EKG, a chest x-ray, and a chest CT with contrast. (*Id*. at 339, 346-347.) The EKG was normal. (*Id*. at 323, 351-352.) The x-ray and CT were negative. (*Id*. at 324, 329.) Dr. Randles diagnosed Plaintiff with "unspecified" chest pain and recommended that Plaintiff continue his medications as directed and follow up with an outpatient stress test. (*Id*. at 348). Plaintiff was discharged from the emergency room with instructions to follow up at Bluitt-Flowers Health Center. (*Id*. at 346, 348.)

On December 12, 2007, Plaintiff visited Parkland's Ambulatory Care Clinic. (*Id*. at 336-337.) He requested a refill on his pain medications at that time. (*Id*. at 337.) His medications included Coumadin, Lortab, Zocor, Amoxil, Clarithromycin, Metoprolol and Nexium. (*Id*.)

On December 12, 2007, Plaintiff saw PA Cope-Tome at Parkland's AMC. (*Id*. at 333.) He

complained of pain in his right calf and knee.  (*Id.*)  Plaintiff reported that the knee pops and swells, and that he used to work on his knees.  (*Id.*)  Plaintiff reported that he visited the emergency room 2 days prior for chest pain, but that he had not experienced any chest pain since then.  (*Id.*)  The record noted Plaintiff was scheduled for an exercise tolerance test the next day.  (*Id.*)  Upon testing, his INR was 2.0.  (*Id.* at 290, 333.)

On December 17, 2007, Plaintiff saw PA Cope-Tome at Parkland's AMC.  (*Id.* at 357.)  He complained of bilateral leg pain, swelling and nausea.  (*Id.*)  He requested more pain medication.  (*Id.*)  He reported that he had already taken all the Lortab he was "given" at the Ambulatory Care Clinic.  (*Id.*)  Upon testing, Plaintiff's INR was 2.5.  (*Id.* at 289, 357.)  PA Cope-Tome advised Plaintiff to continue his Coumadin dose schedule and to go to the emergency room if his symptoms worsened.  (*Id.* at 357.)

On December 20, 2007, Plaintiff saw PA Cope-Tome at Parkland's AMC again.  (*Id.* at 334.)  Upon testing, his INR was 2.7.  (*Id.* at 285, 334.)  She reduced Plaintiff's medication to try to keep his INR between 2 and 2.5  (*Id.*)

On December 27, 2007, Plaintiff saw PA Richard Benson at Parkland's AMC.  (*Id.* at 335.)  Upon testing, his INR was 3.2.  (*Id.* at 288, 335.)  The medical record noted that Plaintiff was compliant with his medications and doing well.  (*Id.*)

On January 3, 2008, Plaintiff underwent a stress EKG.  (*Id.* at 356.)  It revealed no changes indicative of ischemia.  (*Id.*)

On January 4, 2008, Plaintiff saw PA Benson at Parkland's AMC.  (*Id.* at 368.)  Upon testing, his INR was 1.9.  (*Id.* at 269, 368.)  The medical record noted that Plaintiff had no complaints and was doing well.  (*Id.*)

On January 14, 2008, Plaintiff saw Dr. Sunti Srivathanakul at Southeast Dallas Health Center. (*Id*. at 374, 448-450, Doc. 16 at 7.) He complained of pain in his knees and lower legs. (R. at 449.) The record noted Plaintiff's work history as a commercial painter. (*Id*.) Plaintiff's gait was normal, but he had abnormal findings on inspection and palpation, range of motion, stability and alignment, muscle strength, bulk and tone. (*Id*. at 450.) Plaintiff was positive for pain on palpation bilaterally. (*Id*.) Dr. Srivathanakul diagnosed Plaintiff with bilateral knee arthritis and pulmonary embolism and ordered x-rays and MRIs of his knees. (*Id*. at 450.) Dr. Srivathanakul gave him prescriptions for Ultram and Warfarin. (*Id*.)

On January 15, 2008, Plaintiff underwent x-rays and MRIs of his knees through Parkland's radiology department. (*Id*. at 364-365, 372-375.) The x-ray reports revealed normal findings. (*Id*. at 364-365.) The MRI report for Plaintiff's right knee showed a probable horizontal tear of the meniscus, mild partial tearing of the inner fibers of the medial collateral ligament, and noted mild degeneration of the lateral meniscus. (*Id*. at 372.) It revealed patchy marrow edema of the medial tibia and severe grade III and IV chondromalacia of the patellofemoral compartment and evidence of cortical fragment dislodgement. (*Id*.) The MRI report for Plaintiff's left knee showed meniscal degeneration of both the lateral and medial compartments of the knee but revealed no definite meniscal tear. (*Id*. at 374.) It showed questionable findings of a prior healed horizontal tear of the medial meniscus and revealed grade II and III chondromalacia of the patellofemoral joint articular surfaces. (*Id*.)

On January 17, 2008, Plaintiff visited Parkland's Ambulatory Services Clinic. (*Id*. at 359-360.) The record noted that he complained of chest pain similar to his pulmonary embolism episode but stated that it was not as severe and that it only hurt when he breathed deeply or coughed. (*Id*.

at 359.)  Plaintiff reported that his chest pain had improved since his pulmonary embolism diagnosis and that he had no further leg pain.  (*Id*.)  The medical history noted knee pain and the treatment plan indicated that Plaintiff should see an orthopedic specialist soon.  (*Id*. at 359-360.)  An EKG revealed no significant changes since the December 10, 2007 EKG.  (*Id*. at 361.)

On January 31, 2008, Plaintiff saw PA Cope-Tome at Parkland's AMC.  (*Id*. at 362.) Plaintiff's INR level was 2.0.  (*Id*. at 268, 362.)  Plaintiff complained of pain in his knees and stated he had been diagnosed with degenerative joint disease and planned to get an orthopedic evaluation. (*Id*. at 362.)  PA Cope-Tome changed Plaintiff's pain medication from Ultram to Darvocet.  (*Id*.)

On June 11, 2008, Plaintiff saw Dr. Srivathanakul.  (*Id*. at 384-386.)  Plaintiff complained of bilateral knee pain and reported that Ultram was not helping.  (*Id*. at 385.)  The record showed a diagnosis of bilateral knee arthritis.  (*Id*. at 386.)  The record also noted excessive refills.  (*Id*.)  Dr. Srivathanakul gave Plaintiff a prescription for Darvon 65 and referred him for an orthopedic evaluation.  (*Id*.)  Dr. Srivathanakul also signed a Physician's Statement indicating that Plaintiff was unable to work due to a permanent disability.  (*Id*. at 425.)  The disabling condition was listed as knee arthritis.  (*Id*.)

On December 26, 2008, Plaintiff saw Dr. Srivathanakul.  (*Id*. at 381-383.)  Plaintiff complained of knee pain.  (*Id*. at 382.)  He indicated that the Darvon was not helping but that he had taken Lortab and experienced some relief.  (*Id*.)  The medical record indicated that Plaintiff's gait was normal.  (*Id*. at 383.)  It noted abnormal findings on inspection and palpation, range of motion, stability and alignment, muscle strength, bulk and tone.  (*Id*.)  The record also noted a positive finding of pain on range of motion in his right knee.  (*Id*.)  Dr. Srivathanakul diagnosed Plaintiff with knee arthritis.  (*Id*. at 383.)  He gave Plaintiff a prescription for Lorcet and relafen and referred

him to the orthopedic clinic.  (*Id*. at 381.)

On January 28, 2009, Dr. Srivathanakul prescribed Plaintiff hydrocodone-acetaminophen and relafen.  (*Id*. at 378.)

On February 25, 2009, Plaintiff saw Dr. Srivathanakul.  (*Id*. at 440.)  He complained of bilateral knee pain.  (*Id*.)  The medical record noted a diagnosis of knee arthritis.  (*Id*.)  Plaintiff indicated that the orthopedic clinic had refused to see him and he requested a refill of his pain medications.  (*Id*.)  Dr. Srivathanakul gave Plaintiff a refill of his pain medications and re-referred him for an orthopedic evaluation.  (*Id*.)

On March 13, 2009, Plaintiff saw Dr. Hanna J. Abu-Nassar.  (*Id*. at 389-393.)  The medical history noted bilateral knee pain with the right knee worse than the left knee and Plaintiff reported that he had degenerative joint disease.  (*Id*. at 389)  He had not had any injections.  (*Id*.)  His doctor had recommended surgery, but a successful outcome was not definite.  (*Id*.)  Plaintiff used a cane, which his doctor had recommended although he had not prescribed one.  (*Id*.)  He was able to walk one block with the cane; and could walk only 40 feet before developing pain without it.  (*Id*.)  He can stand five minutes at a time and sit one hour at a time.  (*Id*.)  He can lift two pounds level and overhead and carry 2 pounds, bend slowly but cannot squat, and could not climb stairs.  (*Id*.)  He has trouble sleeping because of his knee pain.  (*Id*.)  He watches TV but does not do housework, grocery shopping, cooking or laundry.  (*Id*. at 389-390.)  He does not exercise.  (*Id*. at 390.)  Upon physical examination, Plaintiff's extremities showed no edema, clubbing or cyanosis.  (*Id*. at 391.)  Dr. Abu-Nassar noted tenderness over both knees and at the medial and lateral joint lines.  (*Id*.)  He noted no crepitation, no limitation of motion, no swelling or ballottement and no calf tenderness.  (*Id*.)  Plaintiff had a normal gait but had trouble walking on his toes, heels and in tandem.  (*Id*.)

Plaintiff moved normally but slowly. (*Id*.) Dr. Abu-Nassar ordered an x-ray of Plaintiff's right knee and the x-ray report revealed a mild degree of medial joint width narrowing with no effusion nor chondrocalcinosis or bony abnormalities. (*Id*. at 391, 394.) Dr. Abu-Nassar concluded that Plaintiff had severe degenerative joint disease of both knees with internal derangement; and that the right knee showed more severe changes than the left knee. (*Id*. at 391-392.)

On March 24, 2009, Plaintiff saw Dr. Laurence Ligon for a physical residual functional capacity evaluation. (*Id*. at 397-404.) Dr. Ligon noted that Plaintiff was a 49 year old male alleging disability due to degenerative joint disease in his knees. (*Id*. at 397, 404.) Dr. Ligon found that Plaintiff's exertional limitations limited him to a light work capacity in that he can occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of at least 2 hours in an 8 hour workday, sit for about 6 hours in an 8 hour workday and has an unlimited capacity to push and/or pull. (*Id*. at 398.) His postural limitations included never climbing ladders, ropes and scaffolds and only occasionally climbing ramps/stairs, stooping, kneeling, crouching and crawling. (*Id*. at 399.) Plaintiff's knees had no crepitation, no limitation and no swelling. (*Id*. at 404.) Dr. Ligon noted that Plaintiff's gait was normal, he had normal straight leg raise, and his deep tendon reflexes were normal. (*Id*.) The range of motion of all Plaintiff's joints was normal, and he had a normal grip. (*Id*.) X-rays showed narrowing of the medial joint space. (*Id*.) Dr. Ligon concluded that Plaintiff's allegations were supported in part by the evidence of record. (*Id*.)

On March 25, 2009, Plaintiff saw Dr. Srivathanakul. (*Id*. at 407-408.) Plaintiff complained of bilateral knee pain. (*Id*. at 407.) He requested a refill of Lorcet. (*Id*.) The medical record noted that Plaintiff was not receiving physical therapy, and that he was walking with a cane. (*Id*.) Plaintiff reported that he was applying for disability benefits. (*Id*.) The record also noted that Plaintiff was

not exercising and was gaining weight. (*Id*.) The record noted that Plaintiff's right knee exhibited decreased range of motion, swelling and deformity. (*Id*.) Dr. Srivathanakul gave him a prescription for hydrocodone-acetaminophen and recommended physical therapy and weight loss. (*Id*. at 407-408.)

On May 5, 2009, Dr. Srivathanakul completed a form expressing his opinion of Plaintiff's ability to do work-related activities. (*Id*. at 410-413.) It indicated that Plaintiff could only lift and carry less than 10 pounds frequently and occasionally. (*Id*. at 410.) Plaintiff could stand for less than 2 hours in an 8 hour workday, and his ability to sit was not impaired, but he could only do so for about 2 hours in an 8 hour workday. (*Id*.) Plaintiff had to alternate sitting, standing and walking to relieve discomfort, and he needed to alternate those activities every 30 minutes. (*Id*. at 410-411.) Plaintiff could never twist, stoop, crouch, climb stairs/ladders, kneel, crawl and balance and his ability to push and/or pull was restricted. (*Id*. at 411.) The form indicated shortness of breath and a history of pulmonary embolus as additional impairments. (*Id*. at 412.) Plaintiff required hydrocodone to relieve his pain, and the drug caused drowsiness. (*Id*.) On average Plaintiff's impairments would require him to miss work more than 3 times a month. (*Id*.) Finally, he opined that Plaintiff was incapable of working 8 hours a day, 5 days a week on a regular basis. (*Id*.)

On September 22, 2009, Plaintiff saw Dr. Srivathanakul. (*Id*. at 458.) He received refills of his medications at that time. (*Id*.) The medications listed included hydrocodone-acetaminophen and relafen. (*Id*.)

### 3. Hearing Testimony

On December 7, 2009, Plaintiff, a medical expert and a vocational expert testified at a hearing before the ALJ. (*Id*. at 29-54.) Plaintiff was represented by an attorney. (*Id*. at 29.)

###### a.  *Plaintiff's Testimony*

Plaintiff testified that he was 49 years old and that he was claiming an onset date of November 12, 2007, because that is when he left his job at Goodman Painting.  (*Id*. at 30, 34.)

Plaintiff completed the 11th grade.  (*Id*. at 30.)  He never got a GED but he could read and write well enough to hold a job.  (*Id*. at 31.)  He was 6'4" tall and weighed 280 pounds.  (*Id*.)

Plaintiff had worked in the commercial painting business.  (*Id*. at 30-34.)  His last employer was American Facilities Concepts.  (*Id*. at 31.)  He painted, walked stilts, set up scaffolds and had to carry 5 gallon buckets of paint and boxes of mud that weighed 90 pounds.  (*Id*. at 32-33.)  He worked there for 3 weeks in 2008 but left the job because his knees would not hold up to the work.  (*Id*. at 31-32.)

Plaintiff worked at Goodman Painting and Decorating in Atlanta, Georgia from 2005 to 2007.  (*Id*. at 32.)  He painted, built and climbed scaffolds, climbed extension ladders, and hauled materials up and down staircases.  (*Id*.)  He had to carry spray paint rigs weighing 150 pounds.  (*Id*. at 33.)  He left Goodman Painting because he had pains in his chest and legs.  (*Id*. at 35.)

Plaintiff worked at Specialty Finishes from 2004 to 2005.  (*Id*. at 33-34.)  His work duties were the same as in his job with Goodman.  (*Id*.)

Plaintiff had worked at National Paint and Wall Covering intermittently since the 1980's.  (*Id*.)  That job required a lot of bending over painting baseboards and a lot of climbing.  (*Id*.)

Plaintiff went to Dallas Regional Hospital in 2007 because he had chest pains and difficulty breathing.  (*Id*. at 35-36.)  He had not been treated by a doctor before that time.  (*Id*. at 35.)  He was hospitalized at Dallas Regional for two weeks and at Parkland for four weeks.  (*Id*.)  He suffered a mild heart attack and had blood clots in his legs and lungs.  (*Id*.)  His doctors treated his condition

with medications including blood thinners.  (*Id*. at 35-36.)  He has been on Coumadin since he was discharged from the hospital.  (*Id*. at 35.)

Parkland Hospital performed MRIs on his knees.  (*Id*. at 36.)  The MCL and ACL were torn in both knees, and he had severe arthritis in his knees.  (*Id*.)

Plaintiff started using a cane in February 2009.  (*Id*. at 37.)  His doctor had not prescribed a cane but had told him he needed one.  (*Id*. at 36-37.)  He testified that Parkland will not get you a cane if you need one.  (*Id*. at 36)  His sister got him a walker, and he had been using it for about 3 months.  (*Id*.)  It helped keep the weight off his legs.  (*Id*.)

Plaintiff cannot help with household chores because of his inability to stand or bend over.  (*Id*. at 37.)  He can dress and bathe himself but has to use a shower chair since he cannot stand long enough to shower.  (*Id*. at 38.)  He sits in a chair and watches TV.  (*Id*. at 39.)  He gets up and moves around and walks as much as possible.  (*Id*. at 40.)

Plaintiff had been taking anti-depressants for 3 months, and the medication  made him sleepy in the daytime.  (*Id*. at 40.)  He had suicidal thoughts in the past and felt guilty because he cannot work.  (*Id*. at 41.)

 Plaintiff has trouble sleeping at night because his legs hurt so much, and he  continuously moves his feet and legs.  (*Id*. at 38-39.)  He does not sleep through the night.  (*Id*. at 39.)  His doctors prescribed medication to help him sleep, and it helps a little.  (*Id*.)

Plaintiff has trouble walking.  (*Id*. at 37.)  He cannot walk a city block without having to stop because he gets tired and out of breath, and his knees hurt.  (*Id*. at 37-38.)  He told his doctors about his shortness of breath.  (*Id*. at 38.)  He sprayed a lot of paint in his lifetime, and he did not always use a respirator.  (*Id*.)  His doctor suggested he get a chest x-ray to look at his lungs.  (*Id*.)

Plaintiff has trouble sitting in a straight back chair and he can only sit for 5 to 10 minutes without moving around. (*Id*. at 41.) He can only sit for 20 minutes without having to get up. (*Id*.)

Plaintiff has trouble standing because of the pain in his knees. (*Id*.) He can only stand 15 minutes with the walker; without the walker, he cannot stand that long. (*Id*. at 42.) He does not know how much weight he can lift, but that his doctors gave him a limit of 3 to 5 pounds. (*Id*.)

Plaintiff still experiences chest pain 4 to 5 times a week. (*Id*. at 43.) He takes nitroglycerin, but only when the chest pain gets really bad, and he usually has to lie down after taking it. (*Id*.) A side effect of his medication is frequent trips to the bathroom. (*Id*.) He has to go to the bathroom approximately every hour. Because of the blood thinners he takes, he has to have his blood checked a couple of times a week because his doctors want to keep his blood level at 3. (*Id*. at 43.) He testified that the dentist would not see him because he was on blood thinners. (*Id*. at 44.)

Plaintiff's doctor has suggested surgery as a way to treat his knees. (*Id*.) He would like to have the surgery but he cannot afford it, and Parkland denied him financial assistance. (*Id*.)

### b.    *ME Testimony*

Medical expert (ME) Dr. Howard H. McClure, Jr. reviewed Plaintiff's medical records and testified as to his physical impairments. (*Id*. at 13, 44-48.) He testified that Plaintiff had a history of thrombophlebitis with pulmonary embolization and that he takes Coumadin to prevent a recurrence. (*Id*. at 46.) Plaintiff had a history of chest pain, but the medical records show that it is not due to myocardial eschemia. (*Id*.) The medical evidence regarding Plaintiff's knees was conflicting. X-rays of Plaintiff's knees from 2008 showed normal findings, but x-rays from 2009 showed mild narrowing in the right knee. (*Id*. at 46-47.) MRIs from 2008 revealed evidence of medial meniscus tear and patellar chondromalacia. (*Id*. at 47.) The record from the consultative

13

examination showed no crepitation and normal range of motion.  (*Id*. at 46.)  He opined that Plaintiff suffered from degenerative joint disease in both knees and that he had a residual functional capacity of "10 and 20 with stand and walk of two and eight, postural at occasional with no squatting or crawling.  No ropes, ladders, or scaffolding."  (*Id*. at 47)  He also opined that Plaintiff could sit six out of eight hours and that Plaintiff's work capacity fell somewhere between light and sedentary. (*Id*. at 47-48.)

On cross-examination, Dr. McClure testified that he has seen other cases in which damage is apparent on an MRI but not on an x-ray.  A doctor would only have to observe a patient for a few seconds to assess his gait.  (*Id*. at 48.)  Plaintiff did not have a normal gait at the hearing.  (*Id*.)  He was limited to making findings based on the written record.  (*Id*.)

At the conclusion of the hearing, the ALJ asked the ME whether the medical record reflected that Plaintiff had been prescribed a cane or needed a walker.  (*Id*. at 53.)  He responded that he saw nothing in the record on either point.  (*Id*.)

### c.    *VE Testimony*

Donald Anderson, a vocational expert (VE), also testified at the hearing.  (*Id*. at 49-53.)  He testified that Plaintiff's past relevant work history reflected a combination of a painter (840.381-010, specific vocational preparation of seven, medium, skilled work) and a construction worker with a painting specialty (869.664-014, SVP of four, heavy, semi-skilled).  (*Id*. at 50.)  The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education and work experience could perform Plaintiff's past relevant work with the following limitations: stand/walk no more than two hours and sit for six hours in an eight hour workday; posturals occasionally with no squatting, no crouching, no ropes, ladders or scaffolds.   (*Id*. at 50-51.)  The VE opined that the hypothetical

person could not perform Plaintiff's past relevant work, but that the hypothetical person could perform sedentary work existing in significant numbers in the regional and national economy, such as the jobs of order clerk, charge account clerk, or gauger in a production setting. (*Id.* at 51.) The ALJ asked the VE to opine whether a hypothetical person of Plaintiff's age, education and work experience could perform his past relevant work with the additional limitations of walking less than a block, sitting for only 20 minutes at a time, standing for 10 to 15 minutes at a time, and lifting no more than 3 to 5 pounds. (*Id.*) The VE opined that the hypothetical person with the residual functional capacity described by the ALJ could neither perform Plaintiff's past relevant work nor engage in any substantial gainful work activity. (*Id.* at 52.)

Plaintiff's attorney asked the VE to opine regarding the tolerance for absenteeism for the hypothetical person described in the ALJ's first hypothetical. (*Id.*) The VE opined that the hypothetical person would be expected to attend work on a regular basis and to perform the work on a sustained basis. (*Id.*) The hypothetical person would be unable to perform the work if he missed work more than two times a month. (*Id.*) Plaintiff's attorney also asked the VE to opine regarding the tolerance for bathroom breaks beyond the morning, afternoon and lunch breaks for the hypothetical person described in the ALJ's first hypothetical. (*Id.*) The VE responded that the hypothetical person would be unable to perform the work if he required bathroom breaks more than every two hours. (*Id.* at 52-53.) Finally, Plaintiff's attorney asked the VE to opine regarding the tolerance for lying down one to two times a month due to chest pain for the hypothetical person described in the ALJ's first hypothetical. (*Id.* at 53.) The VE opined that the hypothetical person would not be precluded from performing substantial gainful activity. (*Id.*)

**C.** ***ALJ's Findings***

The ALJ denied Plaintiff's application for benefits by written opinion issued on March 16, 2010.  (*Id.* at 10-22.)  At step 1, the ALJ found that Plaintiff met the insured status requirements through December 31, 2010, and had not engaged in substantial gainful activity since November 12, 2007, his alleged onset date.  (*Id.* at 15.)  At step 2, the ALJ found that Plaintiff's status post pulmonary embolism and severe bilateral degenerative joint disease in the knees qualified as severe impairments.  (*Id.*)  At step 3, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 17.)  At step 4, the ALJ found that Plaintiff has the physical residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except that he is limited to standing or walking at least 2 hours in an 8 hour day and never climbing ladders, ropes and scaffolds and only occasionally climbing ramps/stairs and balancing, stooping, kneeling, crouching and crawling.  (*Id.* at 18.)  Based on the testimony of the vocational expert, the ALJ found that Plaintiff was unable to perform his past relevant work.  (*Id.* at 20.)  Plaintiff was classified as a younger individual age 18-49 on his alleged disability onset date, but had since changed age categories and was closely approaching advanced age.  (*Id.*)  The ALJ found that Plaintiff has a high school education and is able to communicate in English.  (*Id.* at 21.)  The ALJ found transferability of job skills immaterial to the disability determination because the Medical-Vocational Rules supported a finding that Plaintiff was not disabled regardless of whether his job skills are transferable.  (*Id.*)  The ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform given his age, education, work experience and residual functional capacity.  (*Id.*)  He concluded that Plaintiff was not disabled at any time through the date of the decision.  (*Id.* at 22.)

## II.  ANALYSIS

**A.**    *Legal Standards*

### 1.    Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *See id*.  Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *See id*. at 436 and n. 1

### 2.        Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64. The definition of disability under

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A). When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295. An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential 5-step analysis to determine whether a claimant is

disabled:

1.      An individual who is working and engaging in substantial gainful activity will not be found
        disabled regardless of medical findings.

2.      An individual who does not have a "severe impairment" will not be found to be disabled.

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations
        will be considered disabled without consideration of vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not
        disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors
        including age, education, past work experience, and residual functional capacity must be
        considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. §

404.1520(b)-(f)) (currently 20 C.F.R. 404.1520(a)(4)(i)-(v)). Under the first 4 steps of the analysis,

the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first 4 steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step 5 to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). After the Commissioner fulfills this burden, the burden shifts back to the claimant to show that he cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3.   Standard for Finding of Entitlement to Benefits

Plaintiff asks the Court to reverse the Commissioner's decision and award him retroactive benefits from November 12, 2007. In the alternative, he asks the Court to remand the case to the Commissioner for further consideration. When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id*. at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court,

resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

**B.**      ***Issues for Review***

Plaintiff raises the following issues for review:

1.      The decision must be remanded for the payment of benefits because the Administrative Law Judge ("ALJ") failed to give controlling weight to the opinion of the Plaintiff's treating physician.

2.      The decision must be remanded because the residual functional capacity ("RFC") assessment was not based on substantial evidence.

3.      The decision must be remanded because the ALJ failed to provide any reasoning as to why the plaintiff's impairments failed to meet the criteria for the listings.

4.      The decision must be remanded because the ALJ failed to properly evaluate the plaintiff's obesity.

5.      The decision must be remanded because the ALJ's credibility assessment contains errors of law and is not based on substantial evidence.

6.      The decision must be remanded because the RFC assessment does not contain a function-by-function assessment.

7.      The decision must be remanded because the ALJ's hypothetical to the vocational expert ("VE") was ambiguous.

(Doc. 16 at 2.)

**C.**      ***Issue One: Treating Physician Rule***

Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinion of Dr. Srivathanakul, a treating physician, concerning his physical limitations. (*Id*. at 2, 12-18.) He argues that the reasons advanced by the ALJ for rejecting Dr. Srivathanakul's opinion are not borne out by the record. (*Id*. at 14.) He also complains that if the ALJ considered Dr. Srivathanakul's records inadequate, he had a duty to contact Dr. Srivathanakul to determine if additional information was available. (*Id*. at 15.)

### 1.      20 C.F.R. §§ 404.1527, 416.927 and SSR 96-5p

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1529(b).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).[4]  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  20 C.F.R. § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  20 C.F.R. § 404.1527(c)(2).  If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion:  (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."  *See id.* § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician

---

[4]  The FCR cites to the most recent version of the regulations.  The parties' briefs cite to the regulations in effect in 2011.  The amendments to the regulations do not impact the analysis or the outcome.

may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."  *Id.* at 455-56.  Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)."  *Id.* at 453.  A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion."  *Id.* at 458.

Dr. Srivathanakul's opinion, as a treating physician's opinion, was a treating source statement for purposes of 20 C.F.R. § 404.1527(c).  *See* 20 C.F.R. § 404.1502.  The ALJ here did not find as a factual matter, and based on competing first-hand evidence, that another doctor's opinion was more well-founded than Dr. Srivathanakul's opinion, or weigh his opinion on disability against the opinion of other physicians who had treated or examined Plaintiff and had specific medical bases for a contrary opinion.  *Newton*, 209 F.3d at 458.  The ALJ was therefore required to perform the six-factor analysis outlined in 20 C.F.R. § 404.1527(c)(1)-(6) before rejecting Dr. Srivathanakul's opinion.  The ALJ did not perform that analysis, however.  At no point in his narrative discussion did he ever mention Dr. Srivathanakul, weigh his opinion against another medical opinion, find that one opinion was more well-founded than the other, or attempt to show

22

good cause for rejecting his opinion.  Instead, his summary of the medical evidence merely indicated the receipt of a medical source statement from a physician and a summary of the opinions expressed in the statement.[5]  (*Id*. at 17.)  He then observed: "This statement does not reference medical testing or an ongoing treatment protocol.  The medical evidence of record does not contain treatment notes from this physician to support the opinion."  (*Id*.)  This statement in the ALJ's narrative discussion is controverted by records showing that Dr. Srivathanakul ordered the MRIs of Plaintiff's knees.  (*Id*. at 372, 450.)  The record also includes numerous treatment records from Dr. Srivathanakul and other medical providers noting x-rays, MRIs, laboratory work and physical findings consistent with his opinions.  (*Id*. at 364-374, 377-386; 406-07, 410-412, 416-425, 434-435, 437, 440, 445-450, 455, 457-458.)  The ALJ also did not take into account those findings by Dr. Abu-Nassar which tended to support Dr. Srivathanakul's opinions (tenderness over both knees and at the medial and lateral joint lines, normal gait but trouble walking on his toes, heels and in tandem, x-rays showing medial joint width narrowing and a diagnosis of severe degenerative joint disease of both knees with internal derangement).  (*Id*. at 391-394.)  2000) (citation omitted).

The Commissioner urges that Dr. Srivathanakul's medical source statement is a legal conclusion as to the ultimate issue of disability and is not entitled to any weight.  (Doc. 17 at 10.)  The Commissioner also argues that the ALJ performed a thorough analysis of the entire record,

---

[5]  Dr. Srivathanakul opined that Plaintiff could only lift and carry less than 10 pounds frequently and occasionally.  (R. at 410.)  He stated that Plaintiff could stand for less than 2 hours in an 8 hour workday and that Plaintiff could only sit for about 2 hours in an 8 hour workday.  (*Id*.)  He indicated that Plaintiff had to alternate sitting, standing and walking to relieve discomfort and that he needed to alternate those activities every 30 minutes.  (*Id*. at 410-411.)  He opined that Plaintiff could never twist, stoop, crouch, climb stairs/ladders, kneel, crawl and balance.  (*Id*. at 411.)  He indicated that Plaintiff's ability to push and/or pull was restricted.  (*Id*.)  He stated that Plaintiff's shortness of breath and history of pulmonary embolus constituted additional impairments.  (*Id*. at 412.)  He noted that Plaintiff required hydrocodone to relieve his pain and that the drug caused drowsiness.  (*Id*.)  He indicated that on average Plaintiff's impairments would require him to miss work more than 3 times a month.  (*Id*.)  Finally, he opined that Plaintiff was incapable of working 8 hours a day, 5 days a week on a regular basis.  (*Id*.)

including an analysis of opinion evidence pursuant to 20 C.F.R. §§ 404.1527 and 416.927, and that

the opinions expressed by Dr. Srivathanakul are not "supported by medically acceptable clinical and

laboratory diagnostic techniques" and are "inconsistent with . . . other substantial evidence." (*Id.*

at 17 at 10-11.)  *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995) (per curiam).

A physician's opinion that a claimant is unable to work constitutes a medical source opinion

on an issue reserved to the Commissioner, as is an opinion on a claimant's residual functional

capacity.  *See* 20 C.F.R. § 416.927(d)(1)-(2).  Such opinions are never accorded controlling weight

because determinations of disability are legal issues reserved for the Commissioner.  *See Frank v.*

*Barnhart*, 326 F.3d 618, 620 (5th Cir. 2003).  Additionally, upon a showing of good cause, an ALJ

may give a treating physician's opinion little or no weight.  *Newton*, 209 F.3d at 455-56.  However,

Dr. Srivathanakul's medical source statement goes beyond a bare opinion of disability.  It contains

opinions of Plaintiff's ability to perform specific work-related activities as recognized and

encouraged by 20 C.F.R. § 404.1513 and SSR 96-5p.  (R. at 410-412.)  *See* 20 C.F.R. § 404.1513;

SSR 96-5p, 1996 WL 387183 at *4-5.  While the ALJ's decision included an isolated reference to

*Frank*, it included no discussion of Dr. Srivathanakul's opinion.  The ALJ declined to give Dr.

Srivathanakul's opinion even probative weight, not because he expressed an opinion as to a legal

issue, but for reasons that are contradicted by the record.

An ALJ's decision "must stand or fall with the reasons set forth in [his] decision, as adopted

by the Appeals Council", however.  *Newton*, 209 F.3d at 455.  It is well established that a court may

only affirm the ALJ's decision "on the grounds which he stated for doing so."  *Cole v. Barnhart*, 288

F.3d 149, 151 (5th Cir. 2002) (per curiam).  The ALJ did not weigh the opinion against other

medical opinions of record or provide good cause for rejecting it.  An "ALJ must consider all the

record evidence and cannot 'pick and choose' only the evidence that supports his position." *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2001). This failure constitutes legal error. *See Waters v. Massanari*, No. 4:00-CV-1656-Y, 2001 WL 1143149, at *11 (N.D. Tex. Sept. 24, 2001) (holding that the Commissioner had conceded "legal error" when the ALJ improperly evaluated opinions of a treating physician).

### 2.   Prejudice

"Violation of a regulation constitutes error, and will constitute a basis for reversal of agency action and remand when a reviewing court concludes that the error is not harmless." *Pearson v. Barnhart*, 1:04-CV-300, 2005 WL 1397049, at *4 (E.D. Tex. May 23, 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)). A violation of a ruling, on the other hand, "may also constitute error warranting reversal and remand when an aggrieved claimant shows prejudice resulting from the violation." *Id.* (citing *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000)). Prejudice and harmless error analysis, although similar in substance, are different procedurally. *Bornette v. Barnhart*, 466 F. Supp.2d 811, 816 (E.D. Tex. 2006). Remand for failure to comply with a ruling is appropriate only when a complainant affirmatively demonstrates ensuant prejudice. *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). A claimant establishes prejudice by showing that adherence to the ruling might have led to a different decision. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)). Harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp.2d at 816 (citing *Frank*, 326 F.3d at 622.)

Plaintiff suffered prejudice as a result of the ALJ's failure to consider his treating physician's

records and opinions.[6]  The opinions expressed in Dr. Srivathanakul's medical source statement included significant limitations beyond those recognized by the ALJ in determining both Plaintiff's residual function capacity and his ability to engage in any form of substantial gainful activity.  The ALJ posed no hypotheticals to the VE that addressed Dr. Srivathanakul's opinions concerning Plaintiff's residiual functional capacity.  Had the ALJ given proper consideration to the treating physician's records and assessment of Plaintiff's ability to engage in work-related activities, the ALJ might have reached a different decision as to disability.  This is especially true in light of the fact that the burden lies with the Commissioner at step 5 to identify gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  *See Myers v. Apfel*, 238 F.3d 617, 621-22 (5th Cir. 2001) (holding that remand was required when the ALJ failed to consider all evidence from a treating source and failed to present good cause for rejecting it); *Newton v. Apfel*, 238 F.3d 617, 621-22 (5th Cir. 2000) (holding that remand was required when the ALJ failed to consider each of the (prior) § 404.1527(d) factors before declining to give weight to the opinions of the claimant's treating specialist); *Locke v. Massanari*, 285 F. Supp.2d 784, 795 (S.D. Tex. 2001) (finding that an ALJ's failure to consider the criteria set out in (prior) 20 C.F.R. § 404.1527(d)(2) required remand).

Accordingly, the case must be remanded to the Commissioner for reconsideration of Dr. Srivathanakul's opinion under the factors set out in 20 C.F.R. § 1527(c).  Since remand is required on this issue, and its determination could impact the remaining issues for review, the Court does not consider them.

---

[6] This case involves the application of regulations, 20 C.F.R. 404.1527 and 416.927, and a ruling, SSR 96-5p.  In light of that, the prejudice standard–higher of the two standards–is applied here.

## III. RECOMMENDATION

Plaintiff's motion should be **GRANTED**, the decision of the Commissioner should be **REVERSED**, and the case should be **REMANDED** for reconsideration.

**SO RECOMMENDED**, **on this 7th day of September, 2012.**

_IRMA CARRILLO RAMIREZ_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_IRMA CARRILLO RAMIREZ_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE